UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSHUA NEIL HARRELL,

Petitioner,

v.

RICK HILL, Warden,

Respondent.

No.  2:20-cv-00060 JAM GGH P

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(c).

Two issues, which generally involve mixed questions of law and fact, are raised by petitioner in his federal habeas petition:

1.  Whether Petitioner Knowingly, Intelligently, and Voluntarily Waived his Constitutional Right to Counsel; and

2.  Whether the Trial Court Violated Petitioner's Sixth Amendment Right to Counsel of Choice.

*////*

1

1    In one respect, petitioner takes issue with the governing legal standards contending that

2    Indiana v. Edwards, 554 U.S. 164 (2008), applies to this case.  He might have been correct, but

3    his argument was never presented to the trial court, the appellate court, nor the California

4    Supreme Court, and it is therefore unexhausted.  He also insists that the state courts came to

5    AEDPA unreasonable factual determinations in resolving the ordinary competency-to-stand-trial

6    standards for a valid Faretta self-representation waiver.  However, petitioner misapprehends his

7    burden in this federal habeas case where he challenges the factual aspects of the raised counsel

8    issues.[1]  He may not simply conclude, for example, that his Farretta waiver was not voluntary or

9    intelligent.  He must show, by citations to the record, that ultimately, the state appellate court

10   grossly misrepresented the trial court record such that the factual determinations made by the

11   appellate court concerning the waiver were AEDPA unreasonable. Similarly, petitioner must

12   show that the record reflects an impingement of his right to counsel of his choice, and that the

13   appellate court, again, misrepresented the record in coming to its factual conclusions.  As

14   petitioner has done neither, the petition should be denied.

15   *Procedural Background*

16       On March 4, 2015, petitioner was convicted by a jury trial, in consolidated cases

17   FCR306522 and FCR308925, in Solano County Superior Court of second-degree commercial

18   burglary (Cal. Pen. Code § 459), forgery (Cal. Pen. Code § 475(c)), receipt of stolen property

19   (Cal. Pen. Code § 496(c)) and identifying information theft with a prior (Cal. Pen. Code §

20   530.5(c)(2)). ECF No. 18-5 at 307-309. Several sentencing enhancements were also found to be

21   true. ECF No. 18-5 at 310-313. On March 25, 2015, the trial court granted in part petitioner's

22   petition to reduce his sentence pursuant to Proposition 47, The Safe Neighboods and Schools

23   Act ("Proposition 47"), as to his conviction for receipt of stolen and property. ECF No. 18-4 at

24   206-208. The trial court denied the petition for a reduction of his sentence as to his other

25   ////

26   ////

27   [1]    As the text makes clear, petitioner does not challenge the process utilized by the state
     courts to determine the factual issues as being AEDPA defective; he asserts only that the facts
28   were erroneously  determined within that process.

1  convictions. Id. Accordingly, petitioner was sentenced to a total prison term of five years and

2  eight months. ECF No. 18-4 at 208, 209.

3       On October 31, 2017, the California Court of Appeal, First Appellate District ("Court of

4  Appeal") affirmed the judgment. ECF No. 19-3. On February 14, 2018, a petition for review with

5  the California Supreme Court was granted. ECF No. 19-5. However, the California Supreme

6  Court deferred further action on this matter "pending consideration and disposition of related

7  issues in *People v. Gonzales*, S240044, *People v. Guerrero*, S238401, and *People v. Franco*,

8  S233973[.]" Id. at 2 (Cases cited involved issues related to Proposition 47 pending before the

9  California Supreme Court). On January 23, 2019, the California Supreme Court dismissed the

10 petition for review. ECF No. 19-6. On October 7, 2019, the United States Supreme Court denied

11 petitioner's writ of certiorari. ECF No. 19-8.

12      On January 1, 2020, petitioner filed the instant federal petition. ECF No. 1.[2] Respondent

13 has filed an answer, ECF No. 18, and petitioner has filed a traverse, ECF No. 30.

14 *Factual Background*

15      The court has conducted a thorough review of the record in this case, as well as the Court

16 of Appeal's unpublished memorandum and opinion affirming petitioner's judgment of conviction

17 on direct appeal. The appellate court's summary of the facts is consistent with the court's own

18 review of the record.  Accordingly, it is provided below:

19           On May 2, 2014, the trial court conducted the arraignment in
            the Wells Fargo matter and a preliminary hearing in another pending
20          case against defendant. During the preliminary hearing, Vincent
            Maher, defendant's court-appointed counsel, advised the trial court
21          that defendant wanted to represent himself. Defendant confirmed,
            "I'd like to proceed in propria persona and dismiss counsel at this
22          time." The trial court deferred consideration of the request until the
            end of the preliminary hearing, at which point it offered to provide
23          defendant self-representation paperwork. (*Faretta v. California*
            (1975) 422 U.S. 806.) Before it could do so, defendant indicated that
24          he had changed his mind, explaining, "We weren't seeing eye to eye,
            me and him. He wasn't seeing things my way. I was feeling like he

25

26  ----
    [2]      The court affords petitioner application of the mailbox rule as to all his habeas filings in
    state court and federal court. Houston v. Lack, 487 U.S. 266, 275-76 (1988) (pro se prisoner filing
27  is dated from the date prisoner delivers it to prison authorities); Stillman v. Lamarque, 319 F.3d
    1199, 1201 (9th Cir. 2003) (mailbox rule applies to pro se prisoner who delivers habeas petition
28  to prison officials for the court within limitations period).

wasn't really helping me the way I needed, but I think something changed. And I want to work with him still."

Defendant declined to waive time on either matter. He later elaborated that he was "going to beat both of these cases" and was not interested in a plea deal because he had "too much on [his] record already" and had had bad experiences with plea agreements his "whole life."

On June 25, 2014, defense counsel Maher declared a doubt as to defendant's competence to stand trial. The trial court suspended the criminal proceedings against defendant and appointed two experts to evaluate his competency. Defendant vehemently objected, "There's nothing wrong with me. . . . I want to go to trial. It's my right. This is just delaying me. Now, I'm going to stay in jail even longer, and I want out of jail right now. I don't want to be in here any longer. I want to go to trial. . . . Now this is gonna waive my time against my will when—and I'm going to be in jail longer. I want to be released. I want to go to trial. There's nothing wrong with me."

The two experts appointed by the trial court disagreed on whether defendant was competent to stand trial. The trial court then appointed a third expert, who concluded that defendant was competent to stand trial. At the next hearing on September 23, 2014, defense counsel Maher requested a jury trial on the competency issue. Defendant again objected, reiterating several more times that he wanted to proceed to trial on the underlying matters.

Subsequently, on January 7, 2015, defense counsel Maher withdrew his request for a jury trial on the competency issue and agreed to submit the issue on the three expert reports. The trial court found defendant competent to stand trial and reinstated the criminal proceedings against him. Defense counsel again reminded the trial court that defendant was not waiving time in any of his cases.

At the conclusion of the hearing, defendant advised the trial court, "I will need a *Marsden* motion." (*People v. Marsden* (1970) 2 Cal.3d 118.) At the ensuing hearing, defendant clarified, "I don't know if I need to do a *Marsden* motion. I just want to waive counsel." The trial court replied, "Let's do one thing at a time" and turned to the *Marsden* motion first. Defendant pointed to disagreements he had had with defense counsel Maher, including disagreements over the competency issue, whether he should accept a plea deal, and how long it was taking to get his cases to trial. Maher acceded to defendant's wishes and asked to be relieved, at which point the trial court granted the *Marsden* motion and denied the motion for self-representation. The trial court proceeded to appoint Robert Warshawsky to represent defendant.

On January 16, 2015, the trial court conducted arraignments and preliminary hearings in the receipt of stolen property/identity theft matter and another pending matter against defendant. At the outset of the proceedings, Warshawsky told defendant to "[b]e quiet," at which point the bailiff advised defendant, "If I have to tell you one more time I am going to take you to the back. That's final."

4

Warshawsky admonished defendant to "be quiet" on three more occasions, the last of which necessitated a break in the proceedings. The trial court warned defendant that if he continued his disruptive behavior, it would have no choice but to remove him from the courtroom.

On February 19, 2015, at a readiness conference in the Wells Fargo matter, Warshawsky declared a doubt as to defendant's competence. Defendant immediately interjected, "I want to do a *Marsden* motion," explaining "I am not going to sit here and keep suspending my court proceedings. It is not fair, Your Honor. I am completely competent. There is nothing wrong with me. He has no reason to base it. Just because I won't take a deal." Defendant continued, "I am not going to go through this again. I [would] rather represent myself than have another joker like this come around to represent me. I am not going to do it. [¶] . . . [¶] . . . It violates my due process rights, Your Honor. [¶] . . . [¶] . . . My due process rights to a speedy trial and it's being violated over and over again. There is nothing wrong with my competency. [¶] . . . [¶] . . . I am not going through this again. Keeps doing this for five months now. This is fucking bull shit."

At the outset of the ensuing hearing, the bailiff apologized for allowing defendant to use profanity in the courtroom. The trial court replied, "No, no, no. [Defendant] and I we have been doing this for months. This is not new. I wish that we could get to trial." The trial court reassured defendant, "You are very frustrated. [¶] . . . [¶] . . . And I understand. Have a seat."

At this point, defendant addressed the pending cases against him in considerable detail, describing various motions he wanted defense counsel Warshawsky to make. According to defendant, these motions included "a 1538.5 motion to suppress the evidence . . . under the 4th Amendment right of the Constitution, illegal search and seizure" and a motion to reduce some of the charges against him to misdemeanors under "[t]he new law, the Safe Neighborhood to Schools Act, Proposition 47, [Penal Code section] 1170.18, [which] states that if the value of the property is less than $950, it is to be a misdemeanor." Defendant argued that Warshawsky's failure to pursue these arguments demonstrated that "[h]e has been providing me ineffective assistance," explaining that "is one of the reasons why a person can file a *Marsden* motion." The trial court replied, "I know we are not there," noting that Warshawsky was defendant's second court-appointed counsel.

The trial court then turned to defendant's alternative request to represent himself and the following dialogue ensued:

"The Court:  . . . .  What I am thinking is because I have thought before about *Faretta* and self-representation.

"The Defendant:  My 6th Amendment right of the Constitution, self-representation, is being violated.

"The Court: Maybe you would like to represent yourself—

5

"The Defendant: I would.

"The Court: —in this matter.

"The Defendant: And I have been discriminated against under the title to American Disability Act of 1989. And my 5th Amendment for discriminated against is being violated—being discriminated. And my due process rights are being violated all across the board. My 14th Amendment is being violated.

"The Court: This is a *Faretta* form that I would want to [sic] you to consider filling out as to whether you wish to represent yourself.

"The Defendant: I will be representing myself. And we are not going to be suspending the proceedings."

Defendant returned to the pending cases against him and described additional disagreements with Warshawsky over which arguments to pursue, reiterating that he was not willing to accept a plea deal and wanted to get the matter to trial. Defendant told the trial court, "I am done. I am done. And I will be representing myself. I am not going to have another person like him represent me again. And I have every reason and every right to."

Defendant acknowledged, "I am bipolar" and "have emotional issues. But as far as competency, that is not an issue." The trial court observed that it was "thinking you may be capable of representing yourself," referencing its five months of interactions with defendant and the prior competency proceeding. Defendant responded, "I am going to be representing myself. You will get the briefs today. I have been ready and waiting to represent myself."

At this point, the trial court inquired whether defense counsel Warshawsky wished to be heard. Warshawsky replied, "Candidly, . . . the reason I was concerned about his competency is because he perseverates on certain issues." Defendant immediately cut Warshawsky off, at which point the trial court admonished him, "If you are going to represent yourself, you are definitely going to have to follow the rules." Defendant responded, "Okay. You are right, Your Honor. I apologize." Warshawsky then explained that when he and defendant disagreed on legal issues, defendant "just gets mad and yells and gets louder and louder and more forceful." Warshawsky acknowledged, however, that some of defendant's legal arguments were colorable, noting that "if [defendant] wants to represent himself and he does have a theory . . . that voids completely the issue of whether he can cooperate with counsel."

After hearing from Warshawsky, the trial court advised defendant that it was "leaning towards letting you represent yourself because I want to have this go to trial," concluding the problem was not defendant's competence but rather his "capacity to allow a lawyer to work for you." Warshawsky agreed with the trial court's assessment and noted that "given [defendant's] now unequivocal assertion of representing himself [under] *Faretta v. California*, quite

6

frankly, I think the Court's hands are tied." Accordingly, the trial court granted defendant's motion for self-representation, subject to an examination by another expert to confirm defendant's ability to represent himself. The trial court maintained the trial date of March 2, 2015, which was then just seven court days out.

Defendant thanked the trial court and proceeded to inquire whether there was "any possible way that I can contact my family who lives in Belize . . . [¶] . . . because I may want to have—my mother has money for a retainer fee to hire an attorney." The trial court replied, "Well, I would not suggest you do that," inquiring why defendant would want to do so. Defendant answered, "I am a little scared. But I have I think—I have a good case. I hope I do. And, you know, I am just scared of ending up something stuck in prison for a very long time." The dialogue continued:

"The Court: People pay that man right there next to you a lot of money on the outside to represent them. So you got his services compliments of the county, and that hasn't worked out for you. [¶] I can tell you that when your mother goes about to shop and find an attorney, his name is going to come up in the community as someone extremely—

"The Defendant: I am going to get someone outside—I don't trust—am going to get someone outside of Solano County.

"The Court: Well, you can get someone from any county you want.

"The Defendant: Right.

"The Court: You are not going to get a better lawyer. And your mom is going to spend the money for it. Probably going to tell you the same thing to end up back here telling me 'I don't want that lawyer that I hired.' [¶] So I know it is not your money that your mom is going to be spending, but you are telling me you want to represent yourself.

"The Defendant: I do want to represent myself.

"The Court: Then let's go forward.

"The Defendant: But, again, Your Honor, would I be able to contact my family just in case?

"The Court: Hold on a minute.

"The Clerk: Next Thursday is the date of [the trial management conference].

"The Court: Right. Here is the problem—I will give you—authorize you a collect phone call to your home—

"The Defendant: Belize.

7

"The Court: Belize. Two of them from the jail.

"The Defendant: Okay.

"The Court: But if—again, you understand the problem—

"The Defendant: Your Honor—

"The Court: —if you get to hire a new lawyer, it is another continuance.

"The Defendant: The jail phone [won't] allow out-of-the-country phone calls, so that has been my issue. That has been my issue for a long time now is not being able to have contact with my family. My mother lives on a little island in the country of Belize, and she owns a resort. And, you know, she is busy—tied up there on the island with the resort and stuff. [¶] I have not been able . . . to contact her to get an attorney. But I tried to have [Warshawsky] call her. I was under the wrong impression. I was going to have her pay him, and he says, 'No, I am a court-appointed attorney.' You know. Whatever. But—

"The Court: See, he is a very ethical man. He is not interested in taking your mother's money. So—but that is up to you. . . . I can't help you if you can't make a collect phone call to Belize."

The trial court returned to the issue of self-representation, warning defendant that there were some disadvantages to representing himself, including the inability to raise ineffective assistance of counsel on appeal and limited contact with the outside world. The trial court then asked defendant, "Are you are sure you want to represent yourself?" Defendant responded, "Yes, I do. I am positive. I am positive."

The trial court emphasized, "You understand I have to advise you it is against your best interest for all the reasons I just said." Defendant replied, "I know. I got a fool for an attorney now," immediately adding "[t]hat is a joke." The trial court returned to the disadvantages of self-representation, emphasizing the practical difficulties defendant would encounter if he elected to testify at trial and noting that the court would not be able to provide him legal advice.

On February 26, 2015, at the trial management conference, the trial court consolidated the Wells Fargo matter with the receipt of stolen property/identity theft matter, and the prosecution filed a single, consolidated information. Defendant pled not guilty to all of the charges against him and, when asked whether he waived time, replied, "Never."

At the conclusion of the hearing, defendant told the defense investigator, "you will get paid. My mother will pay you." The trial court clarified, "No, the Court is paying him. [¶] . . . [¶] I've decided to let the investigators continue assisting you. Although you fired your lawyer, I'm keeping the investigative firm on, and I'm agreeing

8

1    that they can sit with you at trial to help you manage all of this paper,
2    right, and make sure that they get you dressed out for clothing and
     help you out and get ready for trial." Defendant replied, "Thank you,
3    your Honor. You're the best." He reassured the trial court, "I'm not
     going to let you down this time. In the past, you know, . . . I messed
     up, but I think I got it now. I got all the tools I need now."
4
5    On February 27, 2015, Robert E. Wagner, Ph.D., the expert
     appointed by the trial court to evaluate defendant's ability to
6    represent himself, submitted a detailed report concluding defendant
     was both capable of representing himself and competent to waive his
7    right to counsel. On March 2, 2015, at the outset of the trial, the trial
     court acknowledged receipt of the report and directed that it be filed
     under seal.
8
9    The trial court also acknowledged receipt of defendant's
     nine-page, written *Faretta* form, which defendant had previously
10   completed and mailed to the court. Among other things, the form
     advised defendant of the many disadvantages of self-representation.
11   The form reflects that defendant completed it on February 19, 2015,
     signed it in 2 different places, and initialed its various
12   admonishments in 13 more places. After directing that the form be
     filed, the trial court advised defendant, "So, the *Faretta* motion,
13   again, you're representing yourself on the two cases that we have
     remaining, and if you at any point in the proceedings decide you want
14   to stop representing yourself, you need to let me know, okay?"
     Defendant responded, "Okay."

15   ECF No. 19-3 at 3-10.

16   *The Antiterrorism and Effective Death Penalty Act of 1996 Standards*

17       In this case, as stated in the *Introduction and Summary*, petitioner does belatedly contend

18   that the state courts misconstrued the applicable legal standards, i.e., applied law at odds with

19   established Supreme Court authority, *and* came to unreasonable factual conclusions in applying

20   that law.  The undersigned sets forth the applicable standards for both legal and factual aspects of

21   AEDPA.

22       The statutory limitations of the power of federal courts to issue habeas corpus relief for

23   persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

24   Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254(d) provides:

25   An application for a writ of habeas corpus on behalf of a person in
     custody pursuant to the judgment of a State court shall not be granted
26   with respect to any claim that was adjudicated on the merits in State
     court proceedings unless the adjudication of the claim—
27
     (1) resulted in a decision that was contrary to, or involved
28   an unreasonable application of, clearly established Federal

9

1
2

> law, as determined by the Supreme Court of the United States; or

3
4

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5    For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

6  of the United States Supreme Court at the time of the last reasoned state court decision.

7  Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34,

8  39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529

9  U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general

10 principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

11  not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews,

12 587 U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so

13 widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

14 be accepted as correct. Id.

15    A state court decision is "contrary to" clearly established federal law if it applies a rule

16 contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

17 precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

18 Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

19 writ if the state court identifies the correct governing legal principle from the Supreme Court's

20 decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v.

21 Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

22 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply

23 because that court concludes in its independent judgment that the relevant state-court decision

24 applied clearly established federal law erroneously or incorrectly.  Rather, that application must

25 also be unreasonable." Williams, supra, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S.

26 465, 473 (2007); Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in

27 its independent review of the legal question,' is left with a 'firm conviction' that the state court

28 was 'erroneous.'") "A state court's determination that a claim lacks merit precludes federal

1  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

2  decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

3  U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

4  court, a state prisoner must show that the state court's ruling on the claim being presented in

5  federal court was so lacking in justification that there was an error well understood and

6  comprehended in existing law beyond any possibility for fairminded disagreement." Harrington,

7  supra, 562 U.S. at 103.

8        The court looks to the last reasoned state court decision as the basis for the state court

9  judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). If the last reasoned state court

10  decision adopts or substantially incorporates the reasoning from a previous state court decision,

11  this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v.

12  Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "[Section] 2254(d) does not require a

13  state court to give reasons before its decision can be deemed to have been 'adjudicated on the

14  merits.'" Harrington, supra, 562 U.S. at 100. Rather, "[w]hen a federal claim has been presented

15  to a state court and the state court has denied relief, it may be presumed that the state court

16  adjudicated the claim on the merits in the absence of any indication or state-law procedural

17  principles to the contrary." Id. at 99. This presumption may be overcome by a showing "there is

18  reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

19  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

20  expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that

21  the federal claim was adjudicated on the merits." Johnson v. Williams, 568 U.S. 289, 293 (2013).

22  When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the

23  deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

24  must review the claim de novo. Stanley, supra, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d

25  1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

26        The state court need not have cited to federal authority, or even have indicated awareness

27  of federal authority in arriving at its decision. Early v. Packer, 537 U.S. 3, 8 (2002). Where the

28  state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

11

federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, supra, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Id. at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98.  A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by-case determinations." Id. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id. at 102 (citing Lockyer, supra, 538 U.S. at 75).

The factual underpinnings of application of established Supreme Court authority must also not be AEDPA unreasonable.  Section 2254, subsections (d)(2) and e(1).  The harmonization of these two subsections has caused some difficulty, but generally, both the process used to determine the facts, and the determination of the facts themselves based on the entire record may not be AEDPA unreasonable.  In cases where the post-trial proceedings have permitted expansion of the trial court record, that evidence must show that the pertinent court was clearly and convincingly in error when determining the facts.  Kipp v. Davis, 971 F.3d 939, 953-955 (9th Cir. 2020, Hurles v. Ryan, 752 F.3d 768, 790 (9th Cir. 2014); Murray v. Schriro, 745 F.3d 984, 1000-

1    1001 (9th Cir. 2014).  In this case, petitioner does not challenge the fact-finding process—only

2    the determination of the facts. Since, there was no expansion of the trial court record, the

3    determination of the facts must constitute a misrepresentation of the record as a whole.

4    *Discussion*

5        A.  Whether Petitioner Knowingly, Intelligently, and Voluntarily Waived his Constitutional

6            Right to Counsel

7        Petitioner's argument on this claim is provided, in its entirety, below:

8            During the court proceedings I had two separate attorneys have and
9            attempt to have the proceeding suspended questioning my
             competency. After the second attorney's attempt, I was so frustrated
10           that I did not want another attorney to represent me and I decided to
             represent myself which was not a very good idea. I was found guilty
11           of all charges.

12   ECF No. 1 at 5.

13       In his traverse, petitioner further argues his request to represent himself was done "[o]ut of

14   anger and frustration about the Court proceedings repeatedly delayed under Penal Code Section

15   1368." ECF No. 30 at 7. Petitioner notes he has a history of mental illness however remarks his

16   "request for self-representation was done out of anger and frustration." ECF No. 30 at 7.

17   Petitioner further asserts he did not "intelligently waive his Sixth Amendment right to the

18   assistance of counsel" and that although he was found competent to stand trial, he was not

19   competent to represent himself during his trial without counsel. ECF No. 30 at 9-10 (citing for the

20   first time Indiana v. Edwards, 554 U.S. 164 (2008) (discussed infra in an exhaustion context)).

21       The undersigned first finds that petitioner's conclusions do not fairly raise factual issues

22   subject to review under 28 U.S.C. § 2254 (d)(2).  As set forth in the AEDPA standards section, a

23   state court can fall short of AEDPA's requirements if it issues a factual determination which

24   grossly misrepresents the facts of record or fails to afford procedures which would fairly allow

25   development of the pertinent facts.  Petitioner takes not issue whatsoever with the process which

26   determined his competency.  Indeed, the trial court held at least one evidentiary hearing at which

27   time expert evidence was received.

28   ////

                                                13

1    Moreover, petitioner must do more than conclude that the state courts "got it wrong" in

2    their factual determinations.  Petitioner must show where the state courts misrepresented the

3    record or otherwise ignored it.  If evidence is permitted to be received in post-conviction

4    proceedings (no post-conviction evidence was proffered or received in this case), petitioner must

5    show by clear and convincing evidence that the state court's factual determination would never

6    have been made in light of this evidence.

7    The undersigned finds that the bare assertions petitioner makes in the traverse, even if he

8    is permitted to make assertions which were never made in the petition, simply point to no

9    misrepresentation of the facts or ignoring of the pertinent facts which would allow the state

10    court's decisions to be overturned.  Specifically, petitioner makes no assertion of error in the trial

11    court's finding of competence to proceed to trial after evidentiary hearing was held—the standard

12    to initially view competence to waive counsel.  Petitioner's basic competence to waive counsel

13    and represent himself is therefore a given.  The heightened standard for a defendant to knowingly

14    and intelligently waive his right to counsel, "is not a heightened standard of *competence*." Moran

15    v Godinez, 509 U.S.  389,  400-401 (1993).

16    However, even if one turns to the factual discussion of the appellate court itself with

17    respect to the knowing an intelligent waiver of counsel aspect to see if that discussion per se

18    inherently misrepresents the record, such an assertion fails as well.

19    The California Court of Appeal denied this claim and issued the following opinion:

20                      **Self-Representation**

21                      Defendant claims that the record is insufficient to establish a
         valid waiver of his Sixth Amendment right to the assistance of
22       counsel and, hence, that the trial court erred when it allowed him to
         represent himself at trial. The law governing such claims is well
23       established.

24                      "A defendant in a criminal case possesses two constitutional
         rights with respect to representation that are mutually exclusive. A
25       defendant has the right to be represented by counsel at all critical
         stages of a criminal prosecution. [Citations.] At the same time, the
26       United States Supreme Court has held that because the Sixth
         Amendment grants to the accused personally the right to present a
27       defense, a defendant possesses the right to represent himself or
         herself. [Citation.]

28

                                              14

"The United States Supreme Court has concluded in numerous cases and a variety of contexts that the federal Constitution requires assiduous protection of the right to counsel. The right to counsel is self-executing; the defendant need make no request for counsel in order to be entitled to legal representation. [Citation.] The right to counsel persists unless the defendant affirmatively waives that right. [Citation.] Courts must indulge every reasonable inference against waiver of the right to counsel." (*People v. Marshall* (1997) 15 Cal.4th 1, 20.)

"The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069–1070 (*Koontz*).) "On appeal, we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel." (*Id.* at p. 1070.)

In the present matter, while defendant alludes to his "emotional and psychological instability," he significantly does not challenge the first requirement for a valid waiver—namely, that he had the mental capacity to understand the nature and object of the proceedings against him. (*Koontz, supra,* 27 Cal.4th at p. 1069.) Instead, defendant focuses on the second requirement for a valid waiver, arguing that "the insufficient record" fails to establish that his waiver was "knowing, intelligent, and voluntary." (*Id.* at pp. 1069–1070.) Based on our review of the entire record, as summarized in detail above, we cannot agree.

Contrary to defendant's assertion, the record fails to establish that the trial court "actually raised *Faretta* and encouraged self-representation." Rather, the trial court turned to the question of self-representation only after defendant had already broached the issue on three separate occasions, most recently with his comment that he would "rather represent myself than have another joker like this come around to represent me." Defendant's attempt to characterize his request to represent himself as "not unequivocal" and "made out of a 'temporary whim' and/or 'frustration' and/or in 'passing anger or frustration' " is similarly unavailing. Suffice to say, during the course of the proceedings, defendant repeatedly and unequivocally reaffirmed his desire to represent himself.

Nor does the record support defendant's assertion that the trial court "failed to advise [him] adequately." "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Koontz, supra,* 27 Cal.4th at p. 1070.)

15

1
2
3
4
5
6
7

In the present matter, defendant addressed the pending cases against him at great length and described the various motions and arguments he wanted defense counsel to pursue. And, while admittedly made difficult by defendant's constant interruptions, the trial court orally advised him of several disadvantages of self-representation, including the inability to raise ineffective assistance of counsel on appeal, limited contact with the outside world, the practical difficulties he would encounter if he elected to testify at trial, the fact that the court would not able to provide him legal advice, and the requirement that he abide by the same rules as counsel. In addition, defendant reviewed, initialed, signed, and mailed to the trial court a written nine-page, written *Faretta* form describing the disadvantages of self-representation.

8
9
10
11

In short, having reviewed the entire record, we are confident that defendant understood not only the disadvantages of self-representation but also the risks and complexities of the pending cases against him. (*Koontz, supra*, 27 Cal.4th at pp. 1069–1070.) We therefore conclude that his waiver of his Sixth Amendment right to counsel was knowing and voluntary and, hence, valid. (*Ibid.*)

12   ECF No 19-3 at 10-12.

13   The Sixth Amendment affords an accused the right to self-representation, so long as he

14   knowingly and intelligently elects to do so. Faretta v. California, 422 U.S. 806, 819 (1975). The

15   purpose of whether the defendant has knowingly and intelligently waived his right to counsel "is

16   to determine whether the defendant actually *does* understand the significance and consequences

17   of a particular decision and whether the decision is uncoerced." Godinez v. Moran, 509 U.S. at

18   401 n. 12 (1993). "Although a defendant need not himself have the skill and experience of a

19   lawyer in order competently and intelligently to choose self-representation, he should be made

20   aware of the dangers and disadvantages of self-representation, so that the record will establish

21   that 'he knows what he is doing and his choice is made with eyes open.'" Id. at 835 (citing Adams

22   v. U.S. ex rel. McCann, 317 U.S. 269, 279 (1942).

23   Review of the record demonstrates petitioner clearly and unambiguously requested to the

24   trial judge that he wished to assert his right to self-representation. ECF No. ECF No. 23-1 at 6-7;

25   10-11. The record further reflects petitioner was fully informed of his right to counsel and the

26   disadvantages associated in proceeding without counsel. ECF No. 23-2 at 22-23 (Court advises

27   petitioner the disadvantages of self-representation such as the inability to raise an ineffective

28   assistance of trial counsel on appeal, limited contact to the outside world by not having an

16

1    attorney, limited calls and time in the law library due to being in prison, difficulty of taking the

2    stand and testifying, the jury will determine guilt, and the court's inability to provide legal advice

3    to petitioner.) The Ninth Circuit has not demanded a "meticulous litany" as other circuits have

4    when faced with a defendant seeking self-representation. United States v. Keen, 104 F.3d 1111,

5    1114 (9th Cir. 1996). Instead, the Ninth Circuit has required that "the defendant be made aware of

6    the three elements of self-representation: It must be established that the defendant be made aware

7    of the nature of the charges against him, the possible penalties, and the dangers and disadvantages

8    of self-representation." Id. (internal quotation marks omitted). There is no evidence in the record

9    petitioner's right to counsel was not knowingly and intelligently waived. Petitioner's application

10   to proceed in propria persona also adequately shows petitioner's acknowledgment of the

11   disadvantages associated with self-representation, charges brought against him, and the possible

12   penalties he faced. ECF No. 18-5 at 249-257. Prior to the commencement of trial, the trial court

13   also informed petitioner if at any time during trial proceedings if he no longer wished to continue

14   in self-representation to inform the court. ECF No. 18-9 at 13 ("THE COURT: [...] [Y]ou're

15   representing yourself on two cases that we have remaining, and if you at any point in the

16   proceedings decide you want to stop representing yourself, you just need to let me know, okay?

17   THE DEFENDANT: Okay."). Because the advisements provided to petitioner were adequate,

18   petitioner has failed to establish his waiver was not knowing and voluntary.

19         Petitioner alternatively appears to raise his bipolar diagnosis as an indication he was not

20   competent to proceed with self-representation. However, it is evident that at the time petitioner

21   requested to proceed with self-representation, the trial court found no indication petitioner

22   suffered from a severe mental illness that would render petitioner not competent to conduct trial

23   proceedings without counsel. United States v. Brugnara, 856 F.3d 1198, 1214 (9th Cir. 2017)

24   ("Throughout the trial, [defendant] asked coherent questions and made rational arguments—the

25   only flaw was that his legal theory of the case was wrong. At most, Brugnara's afflictions, such as

26   they are, make him rude and impulsive; they do not rise to the level of a 'severe mental illness'

27   precluding competent self-representation.") Although the trial court noted petitioner's previous

28   history of questionable competence, then being found competent, as well as "a flavor of paranoia"

when petitioner made a comment about his then-attorney trying to "set [him] up" by raising

petitioner's competency, the trial court found that petitioner's competency was not at issue. ECF

No. 23-2 at 10-11; 14-15.[3] And the undersigned agrees. Even if petitioner's mental illness had

previously impacted his ability to represent himself, the issue at the time was not whether

petitioner was capable to proceed without counsel but rather petitioner's ability to want to work

with his appointed counsel. Petitioner clearly understood the implications associated with his

decision to waive his right to counsel and despite the trial court's warnings, petitioner was

adamant he wished to represent himself.[4]  Despite petitioner's own admission of his frustration

and anger being the driving force to waive counsel and proceed *in propia persona,* petitioner fails

to show that he did not knowingly and intelligently waive his right to counsel.  But even then, the

trial court took pains to review the competency matter, one more time. [5]

The undersigned has scrutinized that part of the record were the defendant, after

demanding to represent himself, waffled somewhat with his speculation that his mother, living in

Belize, might be able to find and pay for an attorney "just in case."  ECF No. 23-2 at 21.  After a

discussion of this sheer speculation, aka "pipe dream," the judge asked *again: Are you sure you*

*want to represent yourself?*  The DEFENDANT: *Yes, I do.  I am positive.  I am positive.*"  Id. at

22 (emphasis added). The defendant was adamant that he did not wish an attorney because such

would entail further delay of trial.[6]

---

[3]     "The more I talk to him [petitioner], the more I am confident as the Court that he can—he
is competent within the meaning of the 6th Amendment.  Maybe not to assist his lawyer but I
think he has a competent knowledge of what is going on, having a theory of the defense, knowing
where he wants to go, understanding Prop. 47 having an argument whey he—why he believes he
is entitled to all these things."  ECF No. 23-2 at 14.

[4]     This is not the case where a defendant, who understood the proceedings etc., and who did
*not* wish to represent himself, was nevertheless forced to because he could not get along with
counsel.

[5] "I want Dr. Wagner to give me a report on the morning of trial just to confirm, which I think I
know, but just to confirm that you are okay to go forward with this trial representing yourself."
ECF No. 23-2 at 18.

[6]     Sometimes the waiver of counsel presents tough decisions for a defendant, but it is not
irrational to finally decide that enough delay seeking the unobtainable "perfect counsel," like Don
Quixote's "impossible dream," the "unreachable star," is enough, and more is too much.
Enduring endless incarceration before trial, while seeking such counsel, might well cause
someone's competency to come into question.

18

1          Accordingly, habeas relief is not warranted for this claim. The undersigned recommends

2 this claim be denied.

3     B. <u>Whether the Trial Court Violated Petitioner's Sixth Amendment Right to Counsel of</u>

4        <u>Choice</u>

5        This next claim evolves from the last.  Petitioner's argument on his second claim is

6        provided, in its entirety, below:

7
> I was so frustrated that I decided to represent myself, the trial judge
> p[e]rsuaded me into continued self-representation with comments

8
> like " you should represent yourself" and other similar comments. I
> was scared and really didn't want to continue self-representation and

9
> the trial judge p[e]rsuaded me.

10 ECF No. 1 at 7.

11        In his traverse, petitioner further argues that the trial judge actively discouraged petitioner

12 from retaining counsel in violation of his right to counsel of choice by stating " 'he not do that,'

13 questioning 'why he would do that' […], indicated that he would not retain a better more ethical

14 lawyer than appointed counsel, predicted that his mother's misspent money would probably result

15 in his not wanting the retained counsel, and urged petitioner to represent himself saying 'let's go

16 forward.'" ECF No. 30 at 11.

17        The California Court of Appeal denied this claim and issued the following opinion:

18
> **Right to Counsel of Choice**

19
>      Defendant also asserts that the trial court violated his Sixth
> Amendment and California due process rights to counsel of choice.

20
> The record belies this assertion.

21
>      At no point in the proceedings did defendant request
> representation by counsel of his choice. Rather, immediately after the

22
> trial court granted his request for self-representation, defendant
> inquired whether there was "any possible way that I can contact my

23
> family who lives in Belize . . . . [¶] . . . [¶] . . . because I may want to
> have—my mother has money for a retainer fee to hire an attorney."

24
> As noted above, self-representation and representation by counsel are
> mutually exclusive, and, thus, the trial court properly inquired

25
> whether defendant did, in fact, want to represent himself, to which
> defendant confirmed, "I do want to represent myself."

26

27
>      Defendant explained that he wanted to contact his family
> "just in case." At this point, the trial court authorized defendant to

28
> make two collect telephone calls from the jail to Belize. The trial
> court also noted that if defendant were to retain counsel, it would

1
2
3
4
5

    necessitate another continuance, something defendant had vehemently opposed throughout the proceedings. While defendant stated that he had had problems making out-of-the-country telephone calls from the jail, it appears that he was ultimately able to contact his mother. Specifically, at the ensuing trial management conference, defendant told the defense investigator, "you will get paid. My mother will pay you." The trial court responded that that would not be necessary, as it was paying the investigator.

6
7
8

    Defendant confirmed to Dr. Wagner that the possibility of retaining counsel was, at most, a fall back plan to self-representation. According to defendant, "if he needed additional help he would ask for it" and "his mother would help out by getting a lawyer for him if that proved necessary."

9
10
11
12
13
14

    In short, at no point did defendant indicate that he, his mother, or anyone else was actively attempting to retain counsel to represent him. Nor did defendant request a continuance to allow more time to do so. To the contrary, at the trial management conference on February 26, 2015, just two court days before trial, defendant again reiterated that he would "[n]ever" waive time. Moreover, notwithstanding the trial court's express admonishment to defendant at the outset of trial to advise it "if you at any point in the proceedings decide you want to stop representing yourself," defendant never did so. On this record, defendant's assertion that he was deprived of his right to counsel of choice fails.

15 ECF No. 19-3 at 13-14.

16     The Sixth Amendment provides a criminal defendant the right to the assistance of counsel.

17 Powell v. Alabama, 287 U.S. 45, 53 (1932). This right "guarantees defendants in criminal cases

18 the right to adequate representation, but those who do not have the means to hire their own

19 lawyers have no cognizable complaint so long as they are adequately represented by attorneys

20 appointed by the courts." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624

21 (1989). Moreover, "the Sixth Amendment guarantees a defendant the right to be represented by

22 an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to

23 represent the defendant even though he is without funds." United States v. Gonzalez-Lopez, 548

24 U.S. 140, 144 (2006).

25     As discussed earlier, the record reflects that at one point, petitioner had indicated to the

26 court that he may wish to retain an attorney of his choice after his dissatisfaction with two

27 previously court-appointed counsel. ECF No. 23-2 at 19-23. Petitioner had indicated he was

28 having difficulty contacting his mother in Belize to inquire whether she would pay for counsel of

his choice. The court authorized petitioner's request for two collect calls to Belize. However, petitioner's interpretation of the trial court's "persuasion" to proceed with self-representation misstates the record. The trial court did repeatedly ask petitioner if he was certain he wanted to proceed without counsel because petitioner at times made inclinations that he was unsure or scared of proceeding without counsel. However, each time the trial court asked if he was certain, petitioner was adamant of his decision. See supra. Even when petitioner had expressed fear of proceeding with self-representation, the court granted petitioner's request to call his mother in Belize. However, the trial court warned that a continuance would be required if he retained counsel to allow for more time for trial preparation. Nevertheless, it is clear from the record that petitioner did not pursue the matter any time after or request to the court that he wished to proceed with retained counsel. Whether it was from lack of funds or another reason not stated by petitioner, it is evident that there was no violation of petitioner's Sixth Amendment right. "The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. […] [A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." Wheat v. United States, 486 U.S. 153, 159 (1988). Accordingly, petitioner has failed to establish that he is entitled to habeas relief on this claim. The undersigned recommends this claim be denied.

    C.  Whether the Legal Standard Used to Judge Petitioner's Competency Was Wrongly Decided Based on Godinez v. Moran and not Indiana v. Edwards.

    As observed in the text, Moran did not set a higher competency standard to represent oneself than was applicable to competency to stand trial. The question posed in Indiana v. Edwards, 554 U.S. 164 (2008), was whether states *may* impose a more rigorous competency standard, whatever that "more rigorous" standard might be. California joined the Indiana v. Edwards movement in People v. Johnson, 53 Cal. 4th 519 (2012), holding that California courts *could* find that one was competent to stand trial, but not represent himself. Johnson recognized that Indiana v. Edwards posed a slippery slope risk in that too rigorous a competency standard for self-representation might erode the generally applicable right to represent oneself, i.e., trial courts could not deny self-representation on order to effectuate a more efficient or fair trial. Id. at 531. Johnson refused

21

1  to enunciate more specific than California standards than Edwards had generally set forth.  Id. at

2  530.

3  Petitioner's first problem is that he cites Indiana v. Edwards for the first time anywhere in

4  the traverse.  But getting over that procedural unfairness, petitioner's ultimate problem is that he

5  never raised an Indiana v. Edwards issue in the trial court, the Court of Appeal or the California

6  Supreme Court.  See ECF Nos. 18-11, 19-4.  The claim has therefore never been exhausted.

7  An Indiana v. Edwards claim is not a basic Faretta waiver claim as the Edwards case

8  allows a stricter view of when one is competent to represent himself.  If a defendant, ultimately

9  believes that he should not have been allowed to waive counsel and represent himself, that claim

10  is not obvious per se, Johnson, supra, 53 Cal. 4th at 530, and involves facts limited to the case at

11  hand.  A court needs to know when a party, even after initially demanding to represent himself,

12  changes that position, and says that even if he was competent to stand trial, some sort of stricter

13  standard was necessary before a valid waiver of counsel could be effectuated. One cannot fault a

14  state court for not applying Indiana v. Edwards if no state court was ever asked to apply the

15  stricter standard (whatever that was going to be) to the case.

16  Exhaustion requires that a federal claim be precisely stated. "Both Picard and Harless

17  emphasized that mere similarity of claims is insufficient to exhaust."  Duncan v. Henry, 513 U.S.

18  364, 366 (1995).  For example, raising a substantive claim does not exhaust its similar ineffective

19  assistance of counsel with respect to that same substantive claim.  Kelly v. Small, 315 F.3d 1063,

20  1068 n.2 (2003) overruled on other grounds Robbins v. Carey, 481 F.3d 1143 (9th Cir. 2007).

21  Nor does the undersigned believe that at this late date that petitioner's avoidance of the

22  Indiana v. Edwards question should be excused, and this case held in abeyance while the claim is

23  exhausted.  Reasonable diligence is required for a stay and abeyance.  Rhines v. Weber, 544 U.S.

24  269, 277-278 (2005). Indiana v. Edwards was decided in 2008 and Johnson in 2012, years before

25  this case was final for AEDPA purposes. Casually citing Indiana v. Edwards for the first time in

26  a 2020 traverse is not reasonable diligence. No legally sufficient reason can exist which would

27  permit the delay seen here.

28  ////

22

*Conclusion*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The habeas petition should be denied on its merits and dismissed; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 3, 2021

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

23